## LAUBENHEIMER et al. v. FACTOR.
### No. 4764.

Circuit Court of Appeals, Seventh Circuit.
Oct. 15, 1932.

As Corrected on Denial of Rehearing Nov. 16, 1932.

EVANS, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Northern District of Illinois, Eastern Division; George A. Carpenter, Judge.

Habeas corpus proceeding by John Factor, opposed by H. C. W. Laubenheimer, United States Marshal, and another, to secure petitioner's discharge from custody under commitment in extradition proceeding. From an order discharging petitioner, defendants appeal.

Reversed and remanded with directions.

Franklin R. Overmyer, Adelor J. Petit, Jr., and John G. Drennan, all of Chicago, Ill., for appellants.

Rush C. Butler, Allan J. Carter, S. O. Levinson, G. Gale Gilbert, Jr., and Don M. Peebles, all of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

The appeal is from an order of the District Court discharging Factor, on habeas corpus, from custody under commitment by a United States Commissioner for his rendition to England, from Illinois, where he was found.

The complaint by representatives of the British government charged that Factor was a fugitive from the justice of England, where, it was alleged, he had committed the crime of receiving from Broad Street Press, Limited, large sums of money aggregating £458,500, knowing the same to have been fraudulently obtained, a crime alleged to come within the extradition provisions of treaties between Great Britain and the United States.

There was a protracted hearing before the Commissioner, who found there was cause to believe that Factor had committed in England the crime charged, that it was a crime within the provisions of the treaties between this country and Great Britain, and one that would be criminally punishable in the state of Illinois if committed there; and he ordered Factor to be committed to abide the order of the Secretary of State, to whom he directed the record of the proceedings to be certified pursuant to the applicable federal statute.

Whatever may be disclosed when the cause comes on for trial, it can scarcely be gainsaid that the evidence before the Commissioner tended to indicate the formation in England and the execution there of an ambitious scheme, of which Factor, under various aliases, was the central figure, and whereby vast sums of money were fraudulently extracted from the British public, and much of it knowingly received by Factor, who came with it to Illinois.

We will first dispose of a motion recently made on behalf of Factor to dismiss this appeal upon the ground that the treaty had been misused by the British government and its representatives, in that the extradition proceeding was being employed for the collection of private debts against Factor, claimed to have accrued to British citizens by reason of Factor's said alleged fraudulent conduct.

The motion and its supporting affidavit allege that about the time of the institution of the extradition proceeding there was commenced against Factor in the United States District Court for the Northern District of Illinois a civil action by British complainants for the recovery from Factor of proceeds of his alleged fraudulent conduct, and that counsel representing the British government in the extradition proceeding entered into an agreement whereby such counsel should receive for himself a part of whatever counsel fees should accrue to the attorneys for the complainants in the civil suit; that under date of January 6, 1932, a written contract was made between such counsel for the British government and counsel representing the complainants in the civil suit, whereby the former should receive 30 per cent. of whatever fees so accrued to the latter in the civil suit; that the civil suit against Factor was afterward compromised by the payment to complainants of $1,300,000, and that the reasonableness of complainants' counsel fees was to be adjudicated by the judge of said District Court; that upon the hearing of the matter of the counsel fees the contract between counsel was shown, and the court ordered that $77,000 of the counsel fees al-

628

lowed by the court should be paid into court, and retained for further adjudication as to whether or not said counsel for the British government, who claimed that amount for himself, should be allowed and paid that amount; that it was through such proceeding that Factor and his counsel first learned of any agreement between said counsel for the British government and counsel for complainants in the civil suit for a division of fees; and that upon such hearing of the matter of the counsel fees it was stated that the British Consul General at Chicago and the British Embassy at Washington knew of the said agreement whereby the counsel for the British government should receive for himself a part of any counsel fees accruing in the civil suit.

On behalf of appellants herein it was contended that the facts alleged in the motion and its supporting affidavit, if admitted to be true, did not warrant the granting of the motion.

■ Under our law, extradition is not a judicial function; it is reposed in the Department of State. 18 U. S. C. § 651 (18 USCA § 651). In case the magistrate issuing the warrant of arrest, and hearing the evidence, deems the evidence sufficient to sustain the charge under the treaty, he certifies the same, together with copy of all testimony taken before him, to the Secretary of State, and thereupon his function ceases. No appeal lies to any court from the acts or findings of such committing magistrate. Collins v. Miller, 252 U. S. 364, 40 S. Ct. 347, 64 L. Ed. 616. If the committing magistrate had jurisdiction of the subject-matter, and of the accused, and the offense charged is within the treaty, and there was evidence sufficient to establish the criminality of the accused for purposes of extradition, habeas corpus will not lie to review the action of the magistrate. McNamara v. Henkel, 226 U. S. 520, 33 S. Ct. 146, 57 L. Ed. 330; Bingham v. Bradley, 241 U. S. 511, 36 S. Ct. 634, 60 L. Ed. 1136. In Fernandez v. Phillips, 268 U. S. 311, 45 S. Ct. 541, 542, 69 L. Ed. 970, it was stated that in such proceedings habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense is within the treaty, "and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."

■ This is an appeal from an order of the District Court made in a habeas corpus proceeding, and the function of this court is to review the record made before the District Court with a view to determining whether in that court reversible error intervened. The issue presented by the motion cannot be raised on habeas corpus, and surely not on appeal therein.

We are aware of those instances where, even on appeal, matters may be shown, such as release of errors or settlement of the controversy, whereby further prosecution of the appeal and decision thereon would be moot or futile. But the motion does not present such a case. Here extradition is sought to be defeated through alleged transgression of the treaty by the demanding nation. This involves a question not judicial, but political. It would indeed be incongruous, and tend toward incalculable mischief and complication, to accord to the various courts of the land power to inquire into and to pass upon the motives and conduct of foreign countries in their treaty relations with this country—a function peculiarly within the province of the state department of our government, and indeed made so by statute. 18 U. S. C. §§ 651, 653, 654 (18 USCA §§ 651, 653, 654); In re Lincoln (D. C.) 228 F. 70.

The motion to dismiss the appeal is denied.

The treaty provisions involved are article 10 of the "Webster-Ashburton" Treaty of 1842 (8 Stat. 576) and article 1 of the "Blaine-Pauncefote" Treaty of 1889 (26 Stat. 1508). The first, after specifying by name seven major crimes for the commission of any of which the alleged offender in one country found in the territory of the other may be extradited, proceeds: "Provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, *would justify his apprehension and commitment for trial, if the crime or offence had there been committed.*' * * * *"

The second supplements the extraditable crimes specified in the first by adding ten further classifications of crimes which will subject the offender to extradition. Classification 3, which embodies the crime here charged, is: "Embezzlement; larceny; receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained."

Classification 4 of the article is: "Fraud by bailee, banker, agent, factor, trustee, or director or member or officer of any company, *made criminal by the laws of both countries.*"

Classification 10 is: "Crimes and offences *against the laws of both countries* for the suppression of slavery and slave-trading."

None of the classifications of article 1, except 4 and 10, make any reference to the "laws of both countries."

It is contended for appellants that because classifications 4 and 10 alone of the ten classifications specify the requirement that the offenses therein named be criminal "by the laws of both countries," it follows that there is no such requirement as to the other classifications, and that in this case it is sufficient that the acts charged were criminal by the laws of England. In line with this contention it is further maintained that the above-quoted provision of article 10 of the Treaty of 1842 has application, not to the crime itself as necessarily an offense under the laws of both countries, but only to the *evidence* of criminality whereby apprehension and commitment for trial of the alleged criminal for a crime committed in the asylum country would be justified.

However plausibly or even convincingly these contentions are supported, an insuperable obstacle to our acceptance of them is the fact that the United States Supreme Court has held otherwise. Collins v. Loisel, 259 U. S. 309, 42 S. Ct. 469, 66 L. Ed. 956; Kelly v. Griffin, 241 U. S. 6, 36 S. Ct. 487, 60 L. Ed. 861; Wright v. Henkel, 190 U. S. 40, 23 S. Ct. 781, 47 L. Ed. 948.

Appellants further contend that if identity of the crime in both demanding and asylum countries is required, this would in the instant case be satisfied through a statute of the United States substantially defining the very crime here charged. 18 U. S. C. § 467 (18 USCA § 467). This too seems to have been authoritatively decided contrary to appellants' contention. Pettit v. Walshe, 194 U. S. 205, 24 S. Ct. 657, 48 L. Ed. 938, citing Wright v. Henkel, supra.

This brings us to the controlling question in the cause, well stated in Judge Carpenter's opinion[1] in the District Court in these words: "The record shows that the crime charged in London was, 'Receiving money knowing it to have been fraudulently obtained,' and that such was in fact one of the crimes enumerated in the Treaty of 1889 between this country and Great Britain. The record also shows that 'receiving money knowing it to have been fraudulently obtained' was made criminal by the laws of Great Britain. We are concerned in the present proceeding solely

with the fact whether or not it was a crime in the place of asylum, State of Illinois."

The controversy rages primarily about the proposition of the binding effect here of the following, which was said in Kelly v. Griffin, 241 U. S. 6, 36 S. Ct. 487, 489, 60 L. Ed. 861, in passing on a habeas corpus for Kelly's release from commitment for extradition from Illinois to Canada: "The last charge, stealing or embezzling and receiving money fraudulently obtained needs a word of explanation. It may be assumed that there is no evidence of larceny or embezzlement as (commonly) defined, but the receiving of property known to have been fraudulently obtained is a crime by the laws of both Canada and Illinois."

Appellants contend that this decision of the Supreme Court is controlling here, while appellee maintains that the question of the law of Illinois on that subject is one of fact, determinable upon the evidence thereon before the Commissioner. Appellee's contention thereon, as well as his construction of the Kelly-Griffin decision, is as stated in the following excerpt from Judge Carpenter's opinion: "This is purely a question of fact. It can be nothing else. The record shows evidence was offered by the Respondent of eminent judges and learned assistants to the State's Attorney of Cook County, Illinois. Each one of them testified that as a matter of fact the obtaining of money, knowing it to have been fraudulently obtained, was not a crime in this State. The witnesses, the judges and the assistants to the State's Attorney were open for cross-examination. The Commissioner allowed the other side to offer evidence on the same point, the only limitation being that there should be five such witnesses on each side, and no more."

The judge then discusses Kelly v. Griffin, which he rightly says "is the nub of the whole situation," and proceeds:

"Now, it must be perfectly clear that the Supreme Court of the United States could not, and Mr. Justice Holmes (who delivered the opinion) did not intend to hold that it was an offense against the peace and dignity of the State of Illinois, when in fact it was not.

"Lawyers on both sides have scoured the Acts of Legislature on this point. They have gone all through the Criminal Code. All that they can find is the Fraudulent Conveyance Act.

"Mr. Justice Holmes did say, in general language, that receiving money from one, knowing it was fraudulently obtained, was a

[1] Orally.

crime against the State of Illinois. Whether it was or not was a question of fact. The record in this case discloses that, in fact, there was no such crime in the State of Illinois. No statute has been produced, in the judgment of the Court, making it a crime.

"The testimony of the expert witnesses, if I may so designate them, is all to the effect that there was no such crime on the books of the State of Illinois or at common law, as administered in the State of Illinois. The whole proceeding must stand or fall on that question of fact."

It is thus apparent that the judge treated the decisive question of what is the law of Illinois as a question of fact, and predicated his decision largely upon the testimony of the legal experts who testified.

■ It is too well settled for discussion that federal courts take judicial notice of the public laws of all the states, and of course of the particular state wherein the court is sitting. Straton v. New, 283 U. S. 318, 328, 51 S. Ct. 465, 75 L. Ed. 1060; U. P. R. Co. v. Wyler, 158 U. S. 285, 296, 15 S. Ct. 877, 39 L. Ed. 983; Gormley v. Bunyan, 138 U. S. 623, 635, 11 S. Ct. 453, 34 L. Ed. 1086. This applies as well to authoritative decisions of the highest state tribunal declaring the law of the state. Lamar v. Micou, 114 U. S. 218, 223, 5 S. Ct. 857, 29 L. Ed. 94.

■ No reason is apparent why this should be otherwise on habeas corpus to relieve from commitment for extradition. Indeed, in Hogan v. O'Neill, 255 U. S. 52, 41 S. Ct. 222, 65 L. Ed. 497, it was held that on habeas corpus to relieve from detention for interstate extradition a federal court will judicially notice the laws of the demanding state. We are satisfied that the District Court erred in holding the question to be one of fact, and in according effect to the testimony of the legal experts as to what is the law of Illinois.

■ But if this theory as adopted by Judge Carpenter were correct, and the question as to the law of Illinois were one of fact upon which opinion evidence was proper, the evidence before the Commissioner on this subject was not alone that of the legal experts. There was also evidence decidedly to the contrary.

When the Kelly-Griffin Case was in the District Court of the Northern District of Illinois, before Judge Landis, he gave an opinion to the effect that acts similar to those here alleged were criminal under the law of Illinois as well as the law of Canada, which was seeking Kelly's extradition. The Supreme Court,

on appeal, sustained the discharge by Judge Landis of the writ of habeas corpus which had been sued out by Kelly. The decisions of Judge Landis and of the Supreme Court were before the Commissioner. Furthermore, while Factor's case was pending before the Commissioner, habeas corpus was sued out by him and heard in the same District Court before Judge FitzHenry, of the Southern District of Illinois, who decided[2] that under the ruling of the Supreme Court in Kelly v. Griffin he must hold, and he did hold, the acts charged against Factor were criminal under the laws of Illinois.

If the testimony of the jurists and lawyers was competent as fact evidence of the law of Illinois, these decisions likewise afforded competent evidence bearing upon the same fact, and the Commissioner's finding upon a controverted question of fact is not reviewable upon habeas corpus. Fernandez v. Phillips, 268 U. S. 311, 45 S. Ct. 541, 69 L. Ed. 970; Ornelas v. Ruiz, 161 U. S. 502, 16 S. Ct. 689, 40 L. Ed. 787.

■ The expert witnesses testified that in the Kelly-Griffin opinion the law of Illinois was incorrectly stated, but they advanced different theories for avoiding its binding effect. Some said that it was merely obiter dictum. One of the judges stated that it was not obiter dictum, but was comment upon a question of fact and therefore not binding.

Examination of the Kelly-Griffin opinion indicates to us that, far from being obiter dictum, the quoted excerpt therefrom is a direct and pointed decision of the very thing the Supreme Court undertook to decide. Kelly was charged with a number of crimes against the laws of Canada, among them the very crime here charged. The stated paragraph of the opinion eliminates certain of the charges made, and clears the way for sustaining the extradition upon the treaty crime of receiving property known to have been fraudulently obtained. It assumes there was no evidence against Kelly of the treaty crimes of larceny or embezzlement, which were also charged against him, and sustains as a crime "in both Canada and Illinois" the charge of receiving property known to have been fraudulently obtained. What the court said thereon has such direct bearing upon a definite and controlling issue in that controversy that we are not at liberty here to ignore it as "obiter dictum."

Both in the expert evidence and in Judge Carpenter's opinion it is pointed out that the Supreme Court did not indicate any statute

---

[2] Orally.

of Illinois which declares such acts to be criminal there. But we are concerned with that court's holding, rather than with the route or course whereby the holding was reached. Enough for us to know that the Supreme Court, in a controversy wherein that issue was directly involved, definitely decided that receiving property, knowing it to have been fraudulently obtained, was criminal in Illinois, and afforded basis for extradition under the same treaty provisions here involved.

The duty of the inferior courts in such contingency seems plain. It was well pointed out by one of the testifying judges, saying, in answer to a question as to the duty of courts if the matter had indeed been passed upon by the Supreme Court: "I think that decision of the Supreme Court of the United States of an international extradition is binding on every court in the United States; I don't think there is any doubt about that. We may think it is wrong but we have got to follow it." Any other course would inevitably tend to inharmony and confusion.

Undoubtedly the Supreme Court had before it the opinion of Judge Landis in the District Court, wherein he pointed out that the crime alleged was covered in Illinois by the Fraudulent Conveyance Act (paragraph 294, c. 38, Cahill's Rev. Stat. Ill.); and it seems to us that, in the broad sense, the acts charged against Factor if committed in Illinois might be penalized under that section. A number of other allegedly applicable sections are called to our attention by appellants, among them the Illinois conspiracy laws. While it is true that conspiracy is not one of the extraditable offenses specified in the treaties, yet in practice the charge of conspiracy has been so broadened and amplified that, in effect, it includes and covers a multitude of sins, far beyond the limits of the old-time common law conspiracy. Broadly speaking, if the receipt from others of vast sums of money, with knowledge of the fraudulent manner whereby they were obtained, might be criminally reached in Illinois under its conspiracy laws, this would most likely answer the treaty requirements.

We make these suggestions, not because it is for us to support the Supreme Court's definitely stated conclusion in the Kelly Case, but to indicate our faith that its decision, and its words employed in making it, were not inadvertent, nor a mere slip or oversight—as has been variously suggested—nor out of line with the well defined and commendable trend toward liberality in construing and applying treaties and facilitating the rendition of alleged offenders against the laws of friendly nations.

As indicating such definite tendency, though at risk of prolixity, we quote from some of the many decisions of the Supreme Court. In Grin v. Shine, 187 U. S. 181, 184, 23 S. Ct. 98, 100, 47 L. Ed. 130, it is said:

"There is such a general acknowledgment of the necessity of such treaties that of late, and since the facilities for the escape of criminals have so greatly increased, most civilized powers have entered into conventions for the mutual surrender of persons charged with the most serious nonpolitical crimes. These treaties should be faithfully observed, and interpreted with a view to fulfil our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused.

"In the construction and carrying out of such treaties the ordinary technicalities of criminal proceedings are applicable only to a limited extent. Foreign powers are not expected to be versed in the niceties of our criminal laws, and proceedings for a surrender are not such as put in issue the life or liberty of the accused. They simply demand of him that he shall do what all good citizens are required, and ought to be willing to do, viz., submit themselves to the laws of their country. * * * Where the proceeding is manifestly taken in good faith, a technical noncompliance with some formality of criminal procedure should not be allowed to stand in the way of a faithful discharge of our obligations. Presumably at least, no injustice is contemplated, and a proceeding which may have the effect of relieving the country from the presence of one who is likely to threaten the peace and good order of the community, is rather to be welcomed than discouraged."

In Yordi v. Nolte, 215 U. S. 228, 230, 30 S. Ct. 90, 91, 54 L. Ed. 170, the court quoted with approval from Ex parte Sternaman (D. C.) 77 F. 595: " 'The extreme technicality with which these proceedings were formerly conducted has given place to a more liberal practice, the object being to reach a correct decision upon the main question—is there reasonable cause to believe that a crime has been committed?' "

Benson v. McMahon, 127 U. S. 457, 466, 8 S. Ct. 1240, 1244, 32 L. Ed. 234, involved extradition between Mexico and the United States. It was urged for Benson that the treaty crime of forgery charged against him did not include as a forgery a printed instrument. As to this the court said: "It certain-

ly does not appear from this that the Mexican authorities intended to be bound in the treaty by any very restricted use of the word 'forgery,' when the question concerned an offence of that character committed in Mexico. It is for an offence against Mexican law that the prisoner is held to answer. As he is not now upon final trial, but the only question is whether he has committed an offence for which, according to this treaty, he should be extradited to that country, and there tried, we do not see that in this application to set the prisoner at large, after he has been once committed by an examining court having competent authority, and after having been held to answer in Mexico for the offence charged, this court is bound to examine with very critical accuracy into the question as to whether or not the act committed by the prisoner is technically a forgery under the common law. Especially is this so when the wickedness of the act, the fraudulent intent with which it was committed and the final success by which the fraud was perpetrated, are undoubted."

In Collins v. Loisel, 259 U. S. 309, 42 S. Ct. 469, 470, 66 L. Ed. 956, it was contended that an extraditable offense was not charged. The statute of the demanding country, India, made guilty one who cheated and dishonestly induced one to deliver property to another. The statute of Louisiana, the asylum state, denounced the obtaining by false pretense of property with intent to defraud. The court said: "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions. This was held with reference to different crimes involving false statements in Wright v. Henkel, 190 U. S. 40, 58, 23 S. Ct. 781, 47 L. Ed. 948; Kelly v. Griffin, 241 U. S. 6, 14, 36 S. Ct. 487, 60 L. Ed. 861; Benson v. McMahon, 127 U. S. 457, 465, 8 S. Ct. 1240, 32 L. Ed. 234; and Greene v. United States, 85 C. C. A. 251, 154 F. 401. Compare Ex Parte Piot, 15 Cox, C. C. 208. The offense charged was, therefore, clearly extraditable."

In the Kelly-Griffin opinion, referring to the charge of perjury there also under consideration, the court significantly said: "It is objected that although perjury is mentioned as a ground for extradition in the treaty, the appellant should not be surrendered because the Canadian Criminal Code, § 170, defines perjury as covering false evidence in a judicial proceeding 'whether such evidence is material or not.' As to this it is enough to say that the assertions charged here were material in a high degree, and that the treaty is not to be made a dead letter because some possible false statements might fall within the Canadian law that perhaps would not be perjury by the law of Illinois. 'It is enough if the particular variety was criminal in both jurisdictions.' Wright v. Henkel, 190 U. S. 40, 60, 61, 23 S. Ct. 781, 47 L. Ed. 948, 955, 956."

In Glucksman v. Henkel, 221 U. S. 508, 31 S. Ct. 704, 705, 55 L. Ed. 830, the Supreme Court, speaking by the same Justice who afterwards delivered the opinion in the Kelly-Griffin Case, said: "It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time. For while, of course, a man is not to be sent from the country merely upon demand or surmise, yet if there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose him guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender."

United States ex rel. Klein v. Mulligan, 50 F.(2d) 687 (C. C. A. 2), dealt with a habeas corpus brought to release Klein, found in New York, an associate of Factor, and charged in an extradition proceeding with substantially the same offense as that here in issue. The precise question did not enter into that case, since New York has a statute quite similar to those of Canada and England on the subject of receiving property knowing it to have been obtained by fraud. That case, however, and the opinion of Judge Knox therein in the District Court (1 F. Supp. 635), present some review of the facts, of possible interest here, since substantially all the evidence in Klein's Case was before the Commissioner in the case at bar.

Judge Dickinson's recent opinion in United States ex rel. Geen v. Fetters, 1 F. Supp. 637, in the District Court for the Eastern District of Pennsylvania, is quite to the point. Geen was another of Factor's associates, and his extradition from Pennsylvania to England was sought. Practically all the evidence in his case was offered there, and the issues were substantially identical. It seems from Judge Dickinson's opinion that in the respects here in issue he considered the law of Pennsylvania as similar to that of Illinois— no statute in either state in specific terms defining as a crime the receiving of property

knowing the same to have been obtained by fraud. But he recognized and followed the binding authority of Kelly v. Griffin, saying: "This phase of the discussion may be summed up in the comment that the law of Pennsylvania denounces the crime of 'receiving moneys knowing them to have been fraudulently obtained' quite as nearly as the law of Illinois was found to do in Kelly v. Griffin, 241 U. S. 6, 36 S. Ct. 487, 60 L. Ed. 861."

However, appeal from this order discharging the writ is pending in the Court of Appeals of the Third Circuit.

Neither by statute nor by authoritative judicial decision has there been any change in the law of Illinois upon this subject since Kelly v. Griffin was decided, and regarding as we do the decision in that case as here binding, we must and do conclude that the District Court erred in holding otherwise.

The order of the District Court is reversed, and the cause is remanded to that court with direction to discharge the writ of habeas corpus, and for further proceedings in consonance herewith.

EVANS, Circuit Judge (dissenting).

Judge ALSCHULER, in the majority opinion, has characteristically stated the facts, the questions involved, and the contentions of the parties, so fairly and fully that no additional or modifying statement is necessary or justifiable. Likewise, the reasons for the conclusions reached by the majority are so clearly pronounced as to leave the statement of the grounds of my dissent comparatively easy and to limit our differences to a very narrow compass.

If the cause of action (receiving money knowing it to be fraudulently obtained), a criminal offense in England, is or was an offense against the laws of the state of Illinois, the commonwealth wherein Factor was apprehended, then the judgment of the District Court should be reversed. It is only in reference to the answer to this question that I differ with the majority opinion. The disposition of questions preliminary to this one meets with my approval.

The majority opinion is based entirely upon the Supreme Court decision rendered in Kelly v. Griffin, 241 U. S. 6, 36 S. Ct. 487, 60 L. Ed. 861. That decision, rather than any Illinois statute, is the reliance of the majority opinion (as it was, and is, of appellants' counsel) for the conclusion reached. I confess it was at first determinative of the question with me. A willingness to accept and apply the law as announced by the Supreme

Court must, of course, ever actuate this court.

What effect then should be given to the language of the court in the Kelly Case (page 15 of 241 U. S., 36 S. Ct. 487, 489):

"The last charge, stealing or embezzling and receiving money fraudulently obtained, needs a word of explanation. It may be assumed that there is no evidence of larceny or embezzlement as (commonly) defined, *but the receiving of property known to have been fraudulently obtained is a crime by the laws of both Canada and Illinois.* There may be a doubt whether the appellant, if a party to the fraud, received the money of the government directly from it, or through a third hand so as to be guilty under this count of the complaint. We are not prepared to pronounce his detention upon the count unjustifiable in view of the finding. We assume, of course, that the government in Canada will respect the convention between the United States and Great Britain and will not try the appellant upon other charges than those upon which the extradition is allowed."

If the majority opinion be correct in saying that this quotation settles the case regardless of any erroneous statement therein set forth, then the appeal before us is easily disposed of, and correctly so, by the majority opinion, for I find no justification for saying that the above language of the Supreme Court was dictum.

It seems to the writer, however, that the Supreme Court was announcing a proposition, the soundness of which may, in this, a different case, be challenged. That there has been no change in this respect in the Illinois criminal statutes must be conceded. Appellee has the right to ask, What is the Illinois statute which makes it an offense against the laws of Illinois to do the acts with which he is charged? For appellants with commendable frankness admit that the offense charged was not a crime at common law. Counsel for appellants do not seriously rely upon the statute which Judge Landis said in the Kelly Case was the Illinois statute defining the crime of receiving property knowing the same to have been fraudulently obtained. The offense charged against appellee, which apparently is a criminal offense in England, is at most a species of the genus—fraud. It exists, if at all, only because a statute makes it a criminal offense. Waiving to one side all rules which necessitate a strict construction of the criminal statutes, the stubborn fact which confronts us is that no Illinois statute has been found which makes it a criminal offense

to do the acts charged against appellee. Counsel have not cited any statute, and the court has found none. Nevertheless, although no statute thus exists, we are asked by appellants to admit its existence because the Supreme Court, in the case referred to, was persuaded that such a statute existed.

The facts in the Kelly Case may be distinguished in material respects from the facts in this case. Restricting the holding to the actual facts disclosed, that decision may be distinguished, although there is in the opinion the definite statement to the effect that the receiving of property known to have been fraudulently obtained is a crime by the laws of both Canada and Illinois. In the Kelly Case, the money received was property of the King, which had been embezzled, stolen, or fraudulently obtained through perjury and false statements made respecting the amount of concrete, lumber, bolts, etc., used in the construction of the new Parliament buildings at Winnipeg.

This distinction accounts for the language of the three sentences following the italicized portion of Justice Holmes' opinion, above quoted, which fact should not be overlooked when construing the single sentence upon which appellants rely.

The nearest, or rather the least remote, Illinois statute to which our attention has been called, reads:

"Receiving. § 239. Every person, who, for his own gain, or to prevent the owner from again possessing his property, shall buy, receive or aid in concealing *stolen goods,* or anything the *stealing* of which is declared to be larceny, or property *obtained by robbery or burglary,* knowing the same to have been so obtained, shall be imprisoned in the penitentiary not less than one nor more than ten years, or if such goods or other property or thing does not exceed the value of $15, he shall be fined not exceeding $1,000, and confined in the county jail not exceeding one year." Cahill's Illinois Revised Statutes, chapter 38, par. 507.

The Illinois statute relied upon in the Kelly Case reads as follows:

"Every person who shall be a party to any fraudulent conveyance of any lands, tenements or hereditaments, goods or chattels, or any right or interest issuing out of the same, or to any bond, suit, judgment or execution, contract or conveyance had, made or contrived, with intent to deceive and defraud others, or to defeat, hinder or delay creditors or others of their just debts, damages or demands, or who, being a party as aforesaid, at any time shall wittingly and willingly put in use, avow, maintain, justify or defend the same or any of them as true, and done, had or made in good faith, or upon good consideration, or shall sell, alien or assign any of the lands, tenements, hereditaments, goods, chattels or other things before mentioned, to him conveyed as aforesaid, or any part thereof, shall be fined not exceeding $1,000." Cahill's Ill. Rev. Stats. chap. 38, par. 294.

Obviously it would be impossible to stretch either of these statutes to include one who receives money from another knowing that such other person obtained the money fraudulently.

Opinion evidence, offered by the contending parties before the Commissioner, of legal experts, who testified to the existence, as well as to the nonexistence, of an Illinois criminal statute covering the subject-matter, was irrelevant. The existence of an Illinois state statute defining a crime cannot be established by the opinion of Illinois lawyers, regardless of their high standing at the bar. Such statutes as exist speak for themselves. The federal courts of this circuit take judicial notice of Illinois statutes. Their effect is for the court to determine. Equally far afield was the inquiry made of the same witnesses respecting the effect of the language of the Supreme Court, above quoted.

It is hardly necessary to speculate upon the reasons for the different commonwealths' (including Illinois) action in failing or refusing to make it a criminal offense to receive property knowing the same to have been fraudulently obtained. Whether the danger of abuse of such a statute (whereby the criminal prosecution is made an instrument for the collection of a disputed civil liability) is not greater than the beneficial results incident to a conviction in a criminal prosecution of one who practices fraud in order to sell personal property, is for the legislative, rather than the judicial, branch of the Government to determine. In the instant case the search of counsel, as well as the search of the court, has satisfied me that Illinois has no statute making it a criminal offense to receive property knowing the same to have been fraudulently obtained. The offense charged not being a crime in Illinois, appellants have not brought their case within the terms of the treaty, which alone furnishes the basis for the proceedings in the District Court. The fact that there may be other offenses, such as conspiracy, which might be invoked, is quite immaterial. As pointed out in the majority opinion, the offense charged must (a) be one

of the offenses covered by the treaty and (b) it (*the offense charged*) must be an offense against the laws of both countries. Wright v. Henkel, 190 U. S. 40, 23 S. Ct. 781, 47 L. Ed. 948.

The inquiry before the Commissioner, as before us, was an extremely narrow one. It is one which the court, not the witnesses, must decide. If an Illinois statute exists, what is its wording? None having been found which would sustain a conviction for the offense charged, it follows that appellants have failed in their proof.

While it is highly desirable to give the treaty between the United States and Great Britain the most liberal construction possible to carry out its desired purpose, the courts of both countries have recognized the necessity of the extraditable offense being an offense against the demanding government and the commonwealth wherein the offender has taken his residence. It is not, therefore, for this court to attempt to broaden the terms of the treaty nor for us to make laws to apply to an individual case regardless of our sympathies. We must take the treaty as it is and apply it to the case at hand.

In passing, it may not be inappropriate to observe that any inclination to stretch the terms of the treaty against an alien who seeks refuge in this country vanishes when and if it be made to appear that the counsel for, or the representative of, the demanding government misuses the treaty and makes of it a collection agency. I agree with the majority opinion in its conclusion that any abuse of the use of the treaty must be presented to the Secretary of State and may not be accepted by this court on this appeal as the basis of a motion to dismiss. Yet such misuse of the treaty, if it be established, is utterly repugnant to the spirit of justice and to the enforcement of law and order, which, after all is said, is the background of all these extradition treaties.

It is hardly necessary to add, in view of what has been said, that I agree with the conclusion reached by Judge Carpenter.

HICKS, Circuit Judge, dissenting.